## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SAMANTHA KING, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CONTINENTAL CAFÉ HOLDINGS, LLC,<br><br>　　　　　Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Samantha King ("Plaintiff"), on behalf of herself and all others similarly situated, brings this action against Defendant, Continental Café Holdings, LLC ("Continental" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

## NATURE OF THE ACTION

1.     This class action arises out of Defendant's failures to properly secure and safeguard Plaintiff's and Class Members' sensitive personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information").

2.     Defendant's data security failures allowed a targeted cyberattack to compromise Defendant's network (the "Data Breach") that, upon information and

belief, contained the Private Information of Plaintiff and other individuals ("the Class"). Defendant first became aware of the Data Breach on October 18, 2024.[1] To date, Defendant has not informed Plaintiff and Class Members **when** the Data Breach actually took place.

3.      Continental is a contract dining and refreshment provider spanning across Michigan, Indiana, Ohio, and Pennsylvania.[2]

4.      Defendant admits Plaintiff's and Class Members' Private Information was unlawfully accessed, compromised, and/or stolen in the Data Breach.

5.      The Private Information compromised in the Data Breach included certain personal or protected health information of individuals whose Private Information was maintained by Defendant, including Plaintiff.

6.      Upon information and belief, a wide variety of Private Information was implicated in the breach, including: full names, residential addresses, phone numbers, dates of birth, financial information, driver's licenses, passports, Social Security numbers, health insurance plan information, assigned number for the health insurance provider, health conditions, doctor's notes for medical conditions, and Family Medical Leave Act information.[3]

7.      The Data Breach was a direct result of Defendant's failure to implement

---

[1] *See* **Exhibit 1**.
[2] https://www.continentalserves.com/about-us/
[3] *See* **Exhibit 1**.

adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted.

8.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Private Information from those risks left that property in a dangerous condition.

9.     Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and  (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

10. Defendant impliedly understood its obligations and promised to safeguard Plaintiff's and Class Members' Private Information. Plaintiff and Class Members relied on these implied promises when seeking out and paying for Defendant's services and/or obtaining employment from Defendant. But for this mutual understanding, Plaintiff and Class Members would not have provided Defendant with their Private Information. Defendant, however, did not meet these reasonable expectations, causing Plaintiff and Class Members to suffer injury.

11. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff(s) and Class Members with prompt and full notice of the Data Breach.

12. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Private Information of Plaintiff and Class Members.

13.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

14.    As a result of the Data Breach, Plaintiff and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

15.    Plaintiff and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

16.    Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b)

loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation of value of their PII; and (h) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it collected and maintained.

17.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose Private Information was compromised and/or stolen during the Data Breach.

18.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) breach of fiduciary duty, (iv) unjust enrichment, and (vi) declaratory relief.

19.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

20.     The exposure of one's Private Information to cybercriminals is a bell

that cannot be un-rung. Before this Data Breach, Plaintiff's and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

21.     Plaintiff Samantha King is an adult individual who at all relevant times has been a citizen and resident of Metairie, Louisiana.

22.     Defendant Continental Café Holdings, LLC is a limited liability company headquartered in Sterling Heights, Michigan and located at 35710 Mound Road, Sterling Heights, Michigan 48310.

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Class Members are citizens of states that differ from Defendant, including the Plaintiff.

24.     This Court has personal jurisdiction over Defendant because Defendant conducts business in and has sufficient minimum contacts with Michigan.

25.     Venue is likewise proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this

District and many of Defendant's acts complained of herein occurred within this District.

## FACTUAL BACKGROUND

**A.    Defendant Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims.**

26.    At all relevant times, Defendant knew it was storing valuable and confidential Private Information on Defendant's systems and would, therefore, be an attractive target for cybercriminals.

27.    Defendant also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

28.    These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

29.    The Private Information stolen in the Data Breach has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such

commerce."[4]  PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

30.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S.

31.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's current and former employees and customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

32.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[5]  A complete

---

[4] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/  (last visited Nov. 21, 2024).
[5] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Nov. 21, 2024).

identity theft kit that includes health insurance credentials may be worth up to $1,000

on the black market, whereas stolen payment card information sells for about $1.[6]

33.     According to Experian:

> Having your records stolen in a healthcare data breach can be a
> prescription for financial disaster. If scam artists break into healthcare
> networks and grab your medical information, they can impersonate you
> to get medical services, use your data open credit accounts, break into
> your bank accounts, obtain drugs illegally, and even blackmail you with
> sensitive personal details.

> ID theft victims often have to spend money to fix problems related to
> having their data stolen, which averages $600 according to the FTC.
> But security research firm Ponemon Institute found that healthcare
> identity theft victims spend nearly $13,500 dealing with their hassles,
> which can include the cost of paying off fraudulent medical bills.

> Victims of healthcare data breaches may also find themselves being
> denied care, coverage or reimbursement by their medical insurers,
> having their policies canceled or having to pay to reinstate their
> insurance, along with suffering damage to their credit ratings and
> scores. In the worst cases, they've been threatened with losing custody
> of their children, been charged with drug trafficking, found it hard to
> get hired for a job, or even been fired by their employers.[7]

---

[6] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key
findings from The Global State of Information Security® Survey 2015:
https://www.pwc.com/gx/en/consulting-services/information-security-
survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited
Nov. 21, 2024).

[7] Experian, Healthcare Data Breach: What to Know About them and What to Do
After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-
what-to-know-about-them-and-what-to-do-after-one/ (last visited Nov. 21, 2024).

34.     The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can **sell for up to $1,000 online.**"[8]

35.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

36.     Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained Private Information about the individual, such as names, addresses, email addresses, and affiliations, to gain

---

[8]     https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Nov. 21, 2024).

[9]     United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf (last visited Nov. 21, 2024).

trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

**B.      Defendant Breached its Duty to Protect its Customers' and Employees' Private Information.**

37.      Upon information and belief, Defendant's Privacy Policy is provided or made available to every employee and/or customer both prior to receiving dining services, and upon request.[10]

38.      Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA"). Under state and federal law, businesses like Defendant have duties to protect employees' and customers' Private Information and to notify them about breaches.

39.      The Private Information held by Defendant in its computer system and network included the highly sensitive Private Information of Plaintiff and Class Members.

40.      On or around October 18, 2024, Defendant detected the Data Breach, launched by cybercriminals, on its server. Defendant has yet to inform Plaintiff or

---

[10] *See* https://www.continentalserves.com/privacy-policy/ (last visited Nov. 21, 2024).

Class Members when the Data Breach took place, but has likely compromised multiple thousands of individuals' Private Information.

41.    The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect its customers' and employees' Private Information.

**C.    Plaintiff and Class Members Suffered Damages.**

42.    For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

43.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of

Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

44.     As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

45.     With respect to Data Breaches implicating PHI, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[11]

46.     "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[12]

47.     The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[13]

---

[11] https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited Nov. 21, 2024.

[12] *Id.*

[13] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Nov. 21, 2024).

48.     Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[14]

49.     Plaintiff and the Class Members have been injured by Defendant's unauthorized disclosure of their confidential and private medical records and PHI.

50.     Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attacks so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its current and former employees' and customers' Private Information.

## COMMON INJURIES AND DAMAGES

51.     As result of Defendant's ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

52.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including but not

---

[14] *Id.*

limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution in value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

## A. The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing

53.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

54.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other

hacking crimes against the individual to obtain more data to perfect a crime.

55.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

56.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[15] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[16]     This prevents dark web marketplaces from being easily monitored by authorities or

---

[15] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Nov. 21, 2024).
[16] *Id.*

accessed by those not in the know.

57.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[17] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[18] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[19]

58.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security

---

[17] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Nov. 21, 2024).

[18] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Nov. 21, 2024).

[19] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Nov. 21, 2024).

Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[20]

59.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

60.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social

---

[20] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 21, 2024).

Security number."[21]

61.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[22]

62.    As discussed above, theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records,

---

[21] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Nov. 21, 2024).
[22] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Nov. 21, 2024).

and credit report may be affected."[23]

63.     One such example of criminals using PHI for profit is the development of "Fullz" packages. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

64.     The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

65.     According to the FBI's Internet Crime Complaint Center (IC3) 2019

---

[23] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Nov. 21, 2024).

Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[24]

66.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[25] Defendant did not rapidly report to Plaintiff and the Class that their Private Information had been stolen. Even worse, Defendant has not informed Plaintiff and Class Members *when* the Data Breach took place.

67.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

68.    In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

---

[24] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Nov. 21, 2024).
[25] *Id.*

69.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

70.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[26]

71.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting

---

[26] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Nov. 21, 2024).

administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[27]

72.     According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[28]

73.     Defendant's failure to notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

**B.     Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

74.     As a result of the recognized risk of identity theft, when a data breach

---

[27] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Oct. 1, 2024).
[28] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited Oct. 1, 2024).

occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

75.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

76.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[29]

---

[29] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



77.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to

---

[30] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited Nov. 21, 2024).

place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

## C.    Diminution in Value of the Private Information

78.    PII and PHI is a valuable property right.[32] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

79.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

---

[31] *See* https://www.identitytheft.gov/Steps (last visited Nov. 21, 2024).

[32] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

80.     Private Information can sell for as much as $363 per record according to the Infosec Institute.[33]

81.     Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[34]

82.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36, 37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[38]

83.     As a result of the Data Breach, Plaintiff's and Class Members' Private

---

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Nov. 21, 2024).

[34] *See* https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited Nov. 21, 2024).

[35] *See* https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Nov. 21, 2024).

[36] *See* https://datacoup.com/ (last visited Nov. 21, 2024).

[37] *See* https://digi.me/what-is-digime/ (last visited Nov. 21, 2024).

[38] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Nov. 21, 2024).

Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

**D.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

84.    To date, Defendant has **nothing** to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach. Defendant places the burden on remedying the Data Breach completely on the Plaintiff and Class Members by stating: "[y]ou should also be suspicious of any unanticipated emails, text messages, chats, or voicemails that you may receive …, and you must be vigilant about monitoring your identity and credit to guard against criminals taking advantage."[39]

85.    Given the type of targeted attack in this case and sophisticated criminal activity,  the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money;

---

[39] *See* **Exhibit 1**.

file false tax returns; take out loans or lines of credit; or file false unemployment claims.

86. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

87. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[40] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

88. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

89. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's

---

[40] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Nov. 21, 2024).

Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### E.    Loss of Benefit of the Bargain

90.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, which was a condition precedent to obtain employment, Plaintiff as a consumer understands and expected that she was, in part, paying for services and data security to protect the Private Information required to be collected from her.

91.    In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what she reasonably expected to receive under the bargains struck with Defendant.

### F.    Injunctive Relief is Necessary to Protect Against Future Data Breaches

92.    Moreover, Plaintiff and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to

such data is password protected.

93.     Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, Plaintiff and Class Members suffered or are at an increased risk of suffering:

    a.     loss of the opportunity to control how their Private Information is used;

    b.     diminution in value of their Private Information;

    c.     compromise and continuing publication of their Private Information;

    d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.     delay in receipt of tax refund monies;

    g.     unauthorized use of their stolen Private Information; and

    h.     continued risk to their Private Information —which remains in Defendant's possession—and is thus at risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private

Information.

## G.    Lack of Compensation

94.    Defendant fails to compensate victims of the Data Breach at all, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

95.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

96.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

97.    Further, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

98.    Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.    Finding fraudulent charges;

b.    Canceling and reissuing credit and debit cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Monitoring their medical records for fraudulent charges and data;

e.    Addressing their inability to withdraw funds linked to compromised accounts;

f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.    Placing "freezes" and "alerts" with credit reporting agencies;

h.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.    Contacting financial institutions and closing or modifying financial accounts;

j.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.    Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to

be cancelled; and

l.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

99.  In addition, Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the property of loss of value damages in related cases.

100.  Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

101.  Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach and did not formally notify victims. They have yet to offer an explanation for the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiff and Class.

## PLAINTIFF SAMANTHA KING'S EXPERIENCE

102.   Plaintiff Samantha King is and at all times mentioned herein was an adult individual and a natural person residing in Metairie, Louisiana where she intends to remain.

103.   Plaintiff provided her Private Information to Defendant as a condition of employment with Continental.

104.   Plaintiff received a notice letter from Defendant in or around November 12, 2024 informing her of the Data Breach and the exposure of her Private Information.

105.   Plaintiff only allowed Defendant to maintain, store, and use her Private Information because she believed that Defendant would use at least basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases that stored her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

106.   Plaintiff is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

107.   Plaintiff entrusted her Private Information and other confidential information to Defendant with the reasonable expectation and understanding that

Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her Private Information.

108.   Plaintiff would not have allowed Defendant to collect and maintain Private Information had she known that Defendant would not take reasonable steps to safeguard her Private Information.

109.   In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff suffered injury from a loss of privacy.

110.   Plaintiff has been further injured by the damages to and diminution in value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

111.   The Data Breach has also caused Plaintiff to suffer imminent and impending injury in the form of substantially increased risk of additional future fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

112.   As a result of the actual harm suffered and the increased imminent risk of future harm, Plaintiff has spent time and effort checking her accounts and otherwise mitigating the harmful effects of the Data Breach.

113.   In addition, Plaintiff has spent significant time dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring her own accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was incurred as a result of the Data Breach.

114.   The substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety, especially the indefinite prospect of Plaintiff's Private Information being available to third parties for the rest of her life.

115.   Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

116.   Plaintiff brings this case individually and, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Class:

> All individuals in the United States whose Private Information was compromised in the Defendant's Data Breach discovered on October 18, 2024.

117.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

118.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

119.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. It is believed the class size consists of thousands of class members. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach.

120.    **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

> a.    Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.      Whether Defendant had a duty to maintain the confidentiality of Plaintiff and Class Members' Private Information;

c.      Whether Defendant breached its obligation to maintain Plaintiff and the Class Members' medical information in confidence;

d.      Whether Defendant was negligent in collecting, storing and safeguarding Plaintiff's and Class Members' Private Information, and breached its duties thereby;

e.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

f.      Whether Plaintiff and Class Members are entitled to restitution or disgorgement as a result of Defendant's wrongful conduct; and

g.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

121. **Typicality**.  Plaintiff's claims are typical of the claims of the Class Members.  The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information.  Plaintiff and Class Members were all employees or customers of Defendant, each having their Private Information obtained by an unauthorized third party.

122. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

123. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its common law and statutory duties to secure Private Information on its network server, then Plaintiff and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

124. **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

125. **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records. The claims of Plaintiff and the Class Members are substantially identical as explained above. Certifying the case as a class action

41

will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Class.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

126. Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

127. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

128. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

129. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

130. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow its own privacy policies and practices published to its employees and customers.

131. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised and/or stolen.

132. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect

PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

133. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect the Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its employees and customers.

134. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

135. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

136. The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

137. Defendant violated its own policies not to use or disclose Private Information without written authorization.

138. Defendant violated its own policies by actively disclosing Plaintiff's and the Class Members' Private Information; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information; failing to maintain the confidentiality of

Plaintiff's and the Class Members' records; and by failing to provide timely notice of the breach of Private Information to Plaintiff and the Class.

139.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.   Theft of their Private Information;

b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.   Costs associated with purchasing credit monitoring and identity theft protection services;

d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.      The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g.      Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.      Loss of their privacy and confidentiality in their Private Information;

j.      The erosion of the essential and confidential relationship between Defendant – as an employer and service provider – and Plaintiff and Class Members as employees and customers; and

k.      Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

140.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

141.   Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

142.   When Plaintiff and members of the Class provided their personal information to Defendant, Plaintiff and members of the Class entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their data had been breached and compromised.

143.   Defendant required Plaintiff and Class Members to provide and entrust their Private Information as a condition of obtaining employment and/or services from Defendant.

144.   Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant.

145.   Plaintiff and members of the Class fully performed their obligations under the implied contracts with Defendant.

146.   Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect the Private Information of Plaintiff and members of the Class and by failing to provide timely notice to them that their Private Information was compromised in and as a result of the Data Breach.

147.   As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

148.   Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

149.   This count is brought in the alternative to Plaintiff's breach of implied contract count.  If claims for breach of contract are ultimately successful, this count will be dismissed.

150.   Plaintiff and Class Members conferred a benefit on Defendant by way of customers' paying Defendant to maintain Plaintiff's and Class Members' Private Information.

151.   The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and Class Members.

152.   Defendant failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiff and Class Members, and as a result Defendant was overpaid.

153.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information that they paid for but did not receive.

154.   Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

155.   Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

156.   As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## FOURTH CAUSE OF ACTION
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Class)

157.   Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

158.   This Court is authorized to declare rights, status, and other legal relations, and such declarations shall have the force and effect of a final judgment or decree. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

159.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendant's data security measures remain inadequate, contrary to Defendant's assertion that it has confirmed the security of its network. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of Private Information and remains at imminent risk that further compromises of Private Information will occur in the future.

160.   Pursuant to its authority, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owes a legal duty to secure Private Information and to timely notify employees, customers, or any individuals impacted by the Data Breach under the common law, Section 5 of the FTC Act, HIPAA, various state statutes, and the common law; and

b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure current and former employees' and consumers' Private Information.

161.   This Court also should issue corresponding prospective injunctive relief requiring Defendant to, at minimum 1) disclose, expeditiously, the full nature of the Data Breach, including when the Data Breach occurred, and the types of Private Information accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of Plaintiff's and Class Members' Private Information possessed by Defendant; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

162.   If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

163.   The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

164.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all other similarly situated, pray for relief as follows:

a.   For an order certifying the Class under Federal Rule of Civil Procedure 23 and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c. For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the trier of fact;

d. For an order of restitution, disgorgement, and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g. Awarding pre- and post-judgment interest on any amounts awarded; and

h. Awarding such other and further relief as may be just and proper.

<u>**JURY TRIAL DEMANDED**</u>

A jury trial is demanded on all claims so triable.

Dated: November 21, 2024   Respectfully Submitted,

        */s/ E. Powell Miller*
        E. Powell Miller (P39487)
        Emily E. Hughes (P68724)
        **THE MILLER LAW FIRM**
        950 W. University Drive, Suite 300
        Rochester, MI 48307
        T: (248) 841-2200
        epm@millerlawpc.com
        eeh@millerlawpc.com

        William B. Federman
        Tanner R. Hilton (application for admission forthcoming)
        **FEDERMAN & SHERWOOD**

10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
212 W. Spring Valley Road
Richardson, TX  75081
wbf@federmanlaw.com

*Counsel for Plaintiff and the Putative
Class*